IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION (Birmingham)

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| SCP COLDWORKS, LLC, | ) | Case No. 21-02564 |
| | ) | |
| Debtor. | ) | |

**DEBTOR'S MOTION (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
363, 364, AND 507 AUTHORIZING THE DEBTOR TO (A) OBTAIN
POSTPETITION FUNDING, (B) GRANT SENIOR LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, AND
(C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION;
(III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

SCP Coldworks, LLC ("**SCP Coldworks**" or the "**Debtor**"), Debtor and Debtor in

Possession respectfully represent as follows:

1.     By this motion (this "**Motion**") and for the reasons set forth below, pursuant to

Bankruptcy Code §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6003,

6004 and 9014, the Debtor respectfully requests entry of an interim order (the "**Interim**

**Order**") and a final order (the "**Final Order**"):

(1)     Authorizing the Debtor to obtain secured postpetition financing in an aggregate
principal amount of up to $200,000.00 (the "**DIP Facility**") under the terms
and conditions of that certain Senior Secured, Super-Priority Debtor-in-
Possession Credit and Security Agreement among the Debtor, and the DIP
Lender (each as defined below) from time to time parties thereto, substantially
in the form attached to the Interim Order as **Exhibit A** hereto (as the same may
be amended, restated, supplemented or otherwise modified from time to time
under the terms thereof), and authorizing the Debtor to enter into any related
certificates, agreements, documents and instruments (including any
amendments, restatements, supplements or modifications of any of the
foregoing) delivered under or in connection therewith (collectively, the "**DIP
Facility Documents**");

(2)     authorizing and directing the Debtor to use the proceeds of the DIP Facility
as expressly provided in the DIP Facility Documents and solely in accordance

with the Budget (attached as **Exhibit B**) subject to the appropriate permitted variance;

(3)      authorizing the Debtor to execute and enter into the DIP Facility Documents (where applicable) and to perform its obligations thereunder and such other and further acts as may be required in connection with the DIP Facility Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Facility Documents as such amounts become due and payable;

(4)      authorizing the Debtor to grant security interests, liens and superpriority claims (including a superpriority administrative claim under Section 364(c)(1) of the Bankruptcy Code, liens under §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens under Section 364(d)(1) of the Bankruptcy Code), for the benefit of the DIP, in the DIP Collateral (as defined below) (collectively, the "**DIP Liens**"), including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), to secure all obligations of the Debtor under the DIP Facility (collectively, the "**DIP Obligations**");

(5)      authorizing the Debtor to use, solely in accordance with the Budget (subject to appropriate permitted variances, Cash Collateral of the Pre-Petition Secured Parties (as defined below), and the provision of adequate protection to the Pre- Petition Secured Parties for any diminution in value of their interests in the Pre- Petition Collateral (as defined below), including Cash Collateral;

(6)      modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility Documents, the Interim Order, and, as later applicable, the Final Order;

(7)      waiving any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Interim Order, and as later applicable, the Final Order;

(8)      scheduling an emergency interim hearing (the "**Interim Hearing**") on this Motion for the Court to consider entry of the Interim Order; and

(9)      scheduling a final hearing (the "**Final Hearing**") on this Motion for a date that is before the 30th day after the Petition Date (as defined below) to consider entry of the Final Order authorizing the borrowings under the DIP Facility.

2.      In support of this Motion, the Debtor relies on and incorporates by reference

*Philip L. Hodges' Declaration in Support of the Debtors' Chapter 11 Petition and First*

*Day Pleadings* (the "**First Day Declaration**")[1] filed on October 29, 2021. In further support of this Motion, the Debtor, by and through its undersigned counsel, respectfully represents:

**JURISDICTION AND VENUE**

3.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b).

**BACKGROUND**

**A.     General Background**

4.     On October 29, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to manage and operate its business as debtor in possession under Bankruptcy Code §§ 1107 and 1108.

5.     The Debtor is an Alabama-based frozen sweets retailer, focusing on all-natural gourmet popsicles. Over the last several years many of the Debtor's retail locations have closed as brick and mortar locations became less popular. The Debtor plans to scale back its retail footprint, instead focusing on vending and wholesale sales and distributions while preserving value and exploring future strategic options.

**B.     The Debtor's Secured Prepetition Indebtedness and Capital Structure**

6.     As of the Petition Date, the Debtor has funded debt outstanding of approximately $7,958,676.70 consisting of the principal balance under that certain Credit Agreement by and among ServisFirst Bank and NobleBank & Trust (the "**Pre-Petition Secured Parties**"), SCP Coldworks, LLC, as Borrower, (the "**Pre-Petition Credit**

---

[1] Capitalized terms not otherwise defined in this Motion have the meanings used in the First Day Declaration.

Agreement"). The Debtor also incurs unsecured debt in the ordinary course of their operations.

Through the Pre-Petition Credit Agreement, the Pre-Petition Secured Parties are largely secured by first-priority liens against substantially all of the Debtor's assets.

**C.      The Debtor's Business Performance Declines Amid an Industry Downturn**

7.      As discussed in greater detail in the First Day Declaration, the Debtor's bankruptcy filing is principally driven by the fall retail sales demand. This global issue has constrained the Debtor's liquidity and significantly impaired the Debtor's ability to pay its obligations in the ordinary course of business.

8.      In the face of these negative conditions, the Debtor, like some of its competitors, have been hard hit by declining revenues, which has greatly impeded the Debtor's refinancing efforts.

**D.      The Debtor's Attempts to Address The Immediate Liquidity Needs by  Consummating a Refinancing**

9.      As a result of the decline in earnings, the Debtor has been unable to comply with the financial covenants contained in the Pre-Petition Credit Agreement.  A combination of factors, however, including uncertainty about future retail sales, prevented the Debtor from achieving an out-of-court refinancing.

**E.      The Debtor's Goals in Chapter 11:  Pursue  Strategic Alternatives for the Core Business**

10.      Faced with severe liquidity constraints, the Debtor has concluded in its business judgment that the course of action that will maximize recoveries to its creditors is to avail itself of bankruptcy protection.  While the Debtor's operations continue, the Debtor intends to pursue strategic alternatives to continue the core business as a going concern.

4

The specific type of core business transaction the Debtor pursues will depend on numerous factors. The Debtor and their advisors are currently considering several alternatives.

## F. Need for Debtor in Possession Financing and Use of Pre-Petition Collateral

11. If this Motion is not approved and the Debtor does not obtain authorization to borrow under the DIP Facility and to use the Cash Collateral, the Debtor will suffer immediate and irreparable harm. The Debtor has no unencumbered cash. The Debtor urgently needs funds to make payroll, vendor payments and other expenditures, all as set forth in the first day motions filed concurrently with this Motion, that are critical to their continued viability and ability to reorganize their capital structure. The DIP Facility will provide the Debtor with incremental liquidity necessary not only to operate in the ordinary course in chapter 11.

**SUMMARY OF RELIEF REQUESTED**

12. The Debtor seeks authority to enter into and perform under the DIP Facility Documents and establish the DIP Facility, which provides for postpetition secured loans in an amount not to exceed $200,000.00, subject to the terms and conditions of the DIP Facility Documents. The Debtor further requests that the Court authorize (i) the granting of the DIP Liens, (ii) the use of the Pre-Petition Secured Parties' Cash Collateral, (iii) the priming of the Pre-Petition Secured Parties' Liens in favor of the DIP Liens and (iv) the further relief, including, without limitation, the approval of the Interim Hearing and entry of the Interim Order, and the scheduling of the Final Hearing at which to consider the entry of the Final Order.

**SUMMARY OF TERMS OF THE DIP FACILITY**

13. In accordance with the disclosure requirements of Bankruptcy Rule 4001(b) and (c), the material terms of the DIP Facility, and certain highlighted provisions, are as follows:

## TERMS OF SECURED DEBTOR IN POSSESSION FACILITY

**Borrower:**                      SCP Coldworks, LLC, Debtor in Possession

**DIP Lender and**
**DIP Secured Party:**          Redmont Private Debt Fund III, LP

**DIP Facility:**              A secured credit facility with a maximum credit amount of $200,000 in the format of a revolving line of credit.

**Prepayment:**              Allowed and without penalty.

**Use of Proceeds:**          Working capital needs of the Borrower and other fees and costs related to the chapter 11.

**Fees and Interest Rate:**     No fees.  3.25% fixed interest rate per annum.

**DIP Collateral:**         All loan advances and obligations under the Facility shall be secured by a void, properly perfected security interest and lien on all now existing and hereafter acquired (whether before or after the Petition Date) encumbered assets of Borrower, including, without limitation, accounts, inventory, investment property, real property, chattel paper, machinery and equipment, leaseholds, general intangibles, instruments, documents, contract rights, letter-of-credit rights, intellectual property, and all other business assets, including real estate, cash and cash equivalents (including deposit accounts), and all accessions and substitutions thereto and proceeds therefrom pursuant to § 364(c)(3) of the Bankruptcy Code with priority over all existing security interests and liens held by any party to secure existing obligations.

**Superpriority Claim:**      DIP Lender will also be entitled to have priority over all other administrative claims and expenses, as provided in § 364(c)(1) of the Bankruptcy Code. DIP Lender shall also be entitled to a general administrative claim with respect to Borrower's obligations under the Facility.

| Pre-Petition Secured Parties: | ServisFirst Bank and NobleBank & Trust pursuant to the PrePetition Credit Agreement |
| --- | --- |
| Adequate Protection Payments: | None |
| Affirmative, Negative and Financial Covenants: | None |
| Events of Default: | Any appointment of Chapter 11 Trustee or Examiner; any conversion or dismissal of chapter 11 bankruptcy case. |

## BASIS FOR RELIEF

**A.      Standards of Approval Under §§ 364(c) and 364(d)(1) of the Bankruptcy Code**

14.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

15.      In addition, under § 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1). Specifically, § 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)    the [debtor] is unable to obtain credit otherwise; and

7

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

16. In evaluating proposed postpetition financing under §§ 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

    i. unencumbered credit or alternative financing without superpriority status is available to the debtor;

    ii. the credit transactions are necessary to preserve assets of the estate;

    iii. the terms of the credit agreement are fair, reasonable, and adequate;

    iv. the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

    v. the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

17. Section 364 of the Bankruptcy Code also allows for postpetition financing secured by a priming lien. Section 364(d)(1) provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

    i. the trustee is unable to obtain such credit otherwise; and

    ii. there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

8

11 U.S.C. § 364(d)(1).

18.     For the reasons discussed below, the Debtor satisfies the standards required to access postpetition financing on a superpriority claim and priming lien basis under Sections 364(c) and 364(d) of the Bankruptcy Code.

**B.     The Debtor Cannot Obtain Financing on More Favorable Terms**

19.     In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

20.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

21.     As set forth above and in the First Day Declaration, the Debtor, with the assistance of their financial and other advisors, after conducting restructuring efforts and

carefully reviewing the various alternatives, determined that the DIP Facility is the best available option for, among other things, the following reasons: (i) the DIP Facility offered better overall terms when compared to the overall terms of the considered alternatives; (ii) the DIP Facility had the highest certainty of closing; (iii) the DIP Lender has a substantial base of knowledge with respect to the Debtor's business, their capital structure and the Pre-Petition Collateral, which knowledge ultimately saved the estate diligence-related time and expense.

## C.     The DIP Facility is Necessary to Preserve the Value of the Debtor's Estate

22.     As debtor in possession, the Debtor has a fiduciary duty to protect and maximize their estate's assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility, if approved, will provide working capital critical to funding the Debtor's day-to-day operations. Without access to the DIP Facility, the Debtor would be forced to cease operating, which would result in immediate and irreparable harm to the business and assets by depleting going concern value. Because the Debtor's available and projected liquidity is insufficient to fund their operations, the credit provided under the DIP Facility is necessary to preserve the value of the Debtor's estates for the benefit of all stakeholders.

## D.     Terms of the DIP Facility are Fair, Reasonable and Adequate under the Circumstances

23.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should

Case 21-02564-DSC11    Doc 13    Filed 10/29/21    Entered 10/29/21 16:50:08    Desc Main
Document       Page 10 of 24

also be considered in light of current market conditions. *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

24.     Given the urgent need of the Debtor to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable and in the best interests of the Debtor, the estate and its creditors. The DIP Facility Documents were negotiated in good faith as required by Section 364(e) of the Bankruptcy Code.

**E.     Entry into the DIP Facility Documents Reflects the Debtor's Reasonable Business Judgment**

25.     A debtor's decision to enter into a postpetition lending facility under §364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)

(same).

26.     Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

27.     For the reasons set forth above, the Debtor submits that the entry into the DIP Facility is the exercise of the Debtor's reasonable business judgment.

**F.      Proposed Adequate Protection is Appropriate**

28.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, § 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted). When priming of liens is sought under section 364(d), the courts also

Case 21-02564-DSC11    Doc 13    Filed 10/29/21    Entered 10/29/21 16:50:08    Desc Main
Document      Page 12 of 24

examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens. *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

29.     Courts have considered the preservation and enhancement of collateral to be a critical component of adequate protection. In determining the sufficiency of adequate protection, the Third Circuit noted, in *In re Mt. Olive Hospitality, LLC*, that "a number of bankruptcy courts have looked favorably upon the use of cash collateral where its use served to enhance the secured creditor's position through the generation of additional value." Civ. No. 13-3395, 2014 U.S. Dist. LEXIS 42886, at *16-17 (Mar. 31, 2014); *In re T.H.B. Corp.*, 85 B.R. 192, 193–95 (Bankr. D. Mass. 1988) (stating that part of the Bank's adequate protection was the "fact that the proceeds of accounts receivables are being used by the Debtor to generate new inventory and accounts", and that "[t]he use of the Bank's cash collateral . . . is an element of the Bank's adequate protection"); *Bankers Life Ins. Co. v. Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981) (holding similarly)). The Debtors will make a similar showing.

30.     The Debtors believe that the adequate protection it proposes will certainly protect against any diminution in value of the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral. The proposed adequate protection shall only be provided to the extent there is any diminution in value to the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

**G.     Approval of Use of Cash Collateral is Appropriate**

31.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral

consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

32.     The Debtor has an urgent need for the immediate use of the Pre-Petition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date under the terms of the DIP Facility Documents. The Debtor needs the Cash Collateral to pay operating expenses, including payroll, taxes, and vendors, and to ensure a continued supply of supplies and services essential to the Debtor's business. Otherwise, the Debtor's business will grind to an immediate halt, with damaging consequences for the Debtor and the estate.

33.     The Debtor believes that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Therefore, the Debtor submits that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Facility Documents.

**H.     Approval of Interim Relief**

34.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

35.     As described above, the Debtor has an urgent and immediate need for cash to make payroll, vendor payments and other expenditures, all as set forth in the first day

motions filed concurrently with this Motion, that are critical to their continued viability and ability to reorganize their capital structure. Given the immediate and irreparable harm to be suffered by the Debtor, the estate and its creditors absent interim relief, the Debtor requests that, pending the Final Hearing, the Court schedule an interim hearing within two business days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in the Motion.

## I.     Request for a Final Hearing

36.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## NOTICE

37.     Notice of this Motion will be given to: (i) Office of the Bankruptcy Administrator for the Northern District of Alabama (Birmingham Division); (ii) the holders of the 20 largest unsecured claims against the Debtor; and (iii) counsel to ServisFirst Bank and NobleBank & Trust.  Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in this chapter 11 case.

38.     As this Motion is seeking "first day" relief, and due to the urgency of the relief requested, the Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

39.     No previous request for the relief requested herein was made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Interim Order, (to be filed prior to any first-day hearing) (ii) following the Final Hearing (if such hearing is required) enter the Final Order, and (iii) grant the Debtor such other and further relief as is just and proper.

Respectfully submitted this 29th day of October, 2021.

/s/ Jeffery J. Hartley
JEFFERY J. HARTLEY   (HARTJ4885)
Proposed Attorney for the Debtor
and Debtor in Possession, SCP Coldworks, LLC

Of counsel:
HELMSING LEACH, P.C.
Post Office Box 2767
Mobile, AL 36652
(251) 432-5521
(251) 432-0633 Fax
Email  jjh@helmsinglaw.com

4876-2671-2832, v. 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION (Birmingham)

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| SCP COLDWORKS, LLC, | ) | Case No. 21-02564 |
| | ) | |
| Debtor. | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION
FUNDING; (II) AUTHORIZING USE OF CASH COLLATERAL;
AND (III) GRANTING ADEQUATE PROTECTION**

This matter came before the Court on _____, 2021 for an interim hearing (the "**Interim Hearing**") on the Debtor's Motion (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 Authorizing the Debtor to (A) Obtain Postpetition Funding, (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling a Final Hearing; and (V) Granting Related Relief [Doc. ___] (the "**DIP Motion**"). It appears from the DIP Motion and the record before the Court that, among other things, use of cash collateral and additional funding is necessary to avoid immediate and irreparable harm to the Debtor's estate.

The Court has considered the DIP Motion, the relief sought therein, the presentations of the parties and the current record before the Court. It appears on the record before the Court that approval of the relief set forth in the DIP Motion is appropriate on an interim basis: (1) necessary to avoid immediate and irreparable harm to the Debtor's estate, (2) fair and reasonable and in the best interests of the Debtor, its creditors, estate and equity holders, and (3) essential for the continued operation of the Debtor's business. After due deliberation and consideration, and good and sufficient cause appearing therefore, in accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

Exhibit A

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue of the Debtor's above-captioned bankruptcy case (the "**Bankruptcy Case**") and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     <u>Petition Filed</u>.  The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et. seq.* (the "**Bankruptcy Code**") on October 29, 2021 (the "**Petition Date**").  The Debtor continues in the operation of its business and manages its property as a Debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

C.     <u>Cash Collateral</u>.  "**Cash Collateral**" is defined by § 363(a) of the Bankruptcy Code, and includes post-petition proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in § 522(b) and as the term "proceeds" is described in UCC Section 9-102.

D.     <u>Necessity and Best Interests Concerning Use of Cash Collateral</u>.  The Debtor does not have sufficient unencumbered cash or other assets with which to continue to operate its business. The Debtor requires authority to use Cash Collateral as defined herein in order to continue its business operations without interruption. The Debtor's use of Cash Collateral, to the extent and on the terms and conditions set forth herein and the Pre-Petition Credit Agreement is necessary to avoid immediate and irreparable harm to its estate.

2

E.    Budget.  The Debtor has prepared a 13-week budget, which was annexed to the DIP Motion (**"Exhibit A"**) (such budget shall be referred to as the "**Budget**"). The Budget has been thoroughly reviewed by the Debtor and its management.  It sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby. The Budget may be amended, restated, or extended by agreement of the Debtor, in its sole discretion, or by further order of the Court.

F.    Purposes.  The Debtor seeks authority to use Cash Collateral, subject to the Budget, to meet the ordinary cash needs of the Debtor and for such other purposes necessary to (a) maintain and preserve its assets, and (b) pay items in accordance with the Budget.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:**

1.    The DIP Motion is granted on an interim basis to the extent as set forth herein.

2.    The final hearing (the "**Final Hearing**") on the Motion shall be held on _____, 2021 at _____ __.m. (local time).  Any objections or responses to entry of a final order on the Motion shall be filed **on or before 2:00 p.m. (local time) on _____, 2021**, and served on the following parties: (i) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (ii) the Pre-Petition Secured Parties; (iii) the holders of the 20 largest unsecured claims against the Debtor; and (iv) counsel to the Debtor.  A copy of the Motion and this Order will be electronically served on all parties having filed requests for notice in this chapter 11 case through the CM/ECF System.  Due to the nature of the relief requested in the Motion, no other or further notice need be given.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3

3.     Use of Cash Collateral.  The Debtor is authorized, subject to and in accordance with the Budget and the representations, stipulations, and terms set forth in this Interim Order to use Cash Collateral for the following purposes:

(a)     maintenance and preservation of its assets;

(b)     collection of its accounts receivable; and

(c)     payment of items pursuant to the Budget and this Interim Order.

4.     Reporting.  Consistent with the DIP Orders, upon written request by a lender, the Debtor shall provide: (i) a variance report consistent with the Debtor's form of the Budget annexed hereto as Exhibit A, showing the actual cash receipts and disbursements of the Debtor for the preceding period and reconciling the same to the budgeted line item amounts set forth in the Budget for such period; (ii) periodic cash and accounts receivable and accounts payable reports; and (iii) periodic check and wire registers evidencing all payments made during the previous period.

5.     Adequate Protection.  As adequate protection for the use of Cash Collateral, Redmont Private Debt Fund, III, LP ("Redmont") is GRANTED, without limitation, the following:

(a)     Replacement Lien.  Redmont is hereby granted a replacement lien under §§ 361(1) and 361(2) of the Bankruptcy Code (the "**Replacement Lien**") to the extent Redmont's Cash Collateral is used by the Debtor in all post-petition assets of the Debtor, including, without limitation, all accounts, accounts receivable, chattel paper and electronic chattel paper, deposit accounts, documents, equipment, contracts, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, letters of credit, and all sums on deposit in any account, together with (a) all substitutions

4

and replacements for and products of such property; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or subsequently attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title that cover such goods now or in the future; (e) all collateral subject to liens granted in any of the pre-petition loan documents; (f) any money or other assets of the Debtor now or in the future; (g) proceeds of any of the foregoing; (h) books and records of the Debtor, including all mail or e-mail addressed to the Debtor (collectively, the "**Post-Petition Collateral**"). The Replacement Liens: (i) are and shall be in addition to any valid pre-petition liens; (ii) shall have the same priority in the Debtor's post-petition assets (the "**Post-Petition Collateral**"), and proceeds thereof, that Redmont held in the pre-petition collateral; (iii) are and shall be first priority liens, subject only to liens permitted under the controlling pre-petition credit agreement that are properly perfected, valid, and enforceable without any further action as of the Petition Date; and (iv) shall remain in full force and effect notwithstanding any conversion or dismissal of the Bankruptcy Case.

(b)     Allowed Claim under Section 507(b) of the Bankruptcy Code.  To the extent the adequate protection provided for hereby proves insufficient to protect Redmont from diminution in the value of its collateral, Redmont shall have a superpriority administrative expense claim, pursuant to § 507(b) of the Bankruptcy Code, senior to and with priority over: (i) all costs and expenses of administration of the Debtor's Bankruptcy Case that are incurred under any provision of the Bankruptcy Code, including, without limitation, §§ 503; 506(c); 507(a); or 552(b) of the Bankruptcy Code; and (ii) the claims of any other party under § 507(b) of the Bankruptcy Code.

5

(c) <u>Deemed Perfected</u>. The Replacement Liens granted herein are automatically deemed perfected upon entry of this Interim Order without the necessity of Redmont taking possession, filing financing statements, mortgages or other documents. The Debtor shall execute and deliver to Redmont and any and all UCC Financing Statements, UCC Continuation Statements, Certificates of Title or other instruments or documents actually necessary in order to perfect the security interests and liens in the Post-Petition Collateral and proceeds.

6. <u>Events of Default</u>. The occurrence of any of the following events, without limitation, shall constitute an event of default under this Interim Order (each an "**Event of Default**"): (i) the Debtor fails to duly and punctually observe, perform or discharge any obligation or duty imposed upon it by this Interim Order (ii) conversion of the case to Chapter 7; or (iii) the appointment of an Examiner with expanded powers. Upon the occurrence of an Event of Default, unless cured by the Debtor after ten (10) days written notice by Redmont, the Debtor's use of Cash Collateral shall automatically terminate.

7. <u>No Release of Liens</u>. Under no circumstances shall any of Redmont's liens, whether arising pre-petition or post-petition, be required to be released unless and until all obligations have been satisfied in full and are no longer subject to challenge and any claims or causes of action relating to the Debtor have been fully and finally resolved by Interim court order with any appeal period having expired.

8. <u>Survivability; Binding Effect</u>. The provisions of this Interim Order shall be binding upon the Debtor and its buyers, successors and assigns. In the event that this Bankruptcy Case is dismissed, superseded, substantively consolidated with another Chapter 11 case or entity, or the Debtor merges into any other entity under any plan of reorganization, neither the dismissal

6

of this Case, nor such consolidation or merger shall affect the rights of Redmont under this Interim Order and all of Redmont's rights and remedies thereunder and hereunder shall remain in full force and effect.

9.    <u>No Waiver of Existing Defaults.</u>  Neither the authorization to use Cash Collateral set forth herein, nor Redmont's consent thereto, shall be construed as a waiver of any existing defaults by the Debtor, and all such rights are expressly reserved and preserved.

10.    <u>A Final Hearing.</u>

DATED this _____ day of _____, 2021.

_____
JUDGE, U.S. BANKRUPTCY COURT

PREPARED BY:
Jeffery J. Hartley
HELMSING LEACH, P.C.
Post Office Box 2767
Mobile, AL 36652
(251) 432-5521
(251) 432-0633 Fax
Email  jjh@helmsinglaw.com

APPROVED BY:

_____

_____

_____

_____

4868-6812-4929, v. 1

7

**SCP Coldworks, LLC**
**13 Week Budget - Cash Basis**

| | Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Start | 11/1/2021 | 11/8/2021 | 11/15/2021 | 11/22/2021 | 11/29/2021 | 12/6/2021 | 12/13/2021 | 12/20/2021 | 12/27/2021 | 1/3/2022 | 1/10/2022 | 1/17/2022 | 1/24/2022 | |
| | Week End | 11/7/2021 | 11/14/2021 | 11/21/2021 | 11/28/2021 | 12/5/2021 | 12/12/2021 | 12/19/2021 | 12/26/2021 | 1/2/2022 | 1/9/2022 | 1/16/2022 | 1/23/2022 | 1/30/2022 | |
| **Anticipated Inflows** | | | | | | | | | | | | | | | |
| Anticiapted DIP Loan | | 200,000.00 | | | | | | | | | | | | | 200,000.00 |
| Summit Sales | | 3,500.00 | 3,500.00 | 3,000.00 | 2,750.00 | 2,750.00 | 2,500.00 | 2,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 2,000.00 | 2,000.00 | 30,500.00 |
| Waterside Sales | | 3,500.00 | 3,500.00 | 3,000.00 | 2,750.00 | 2,750.00 | 2,500.00 | 2,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 2,000.00 | 2,000.00 | 30,500.00 |
| Vending and Wholesale Sales | | 8,500.00 | 13,500.00 | 6,500.00 | 6,000.00 | 6,000.00 | 5,000.00 | 5,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 3,000.00 | 3,000.00 | 64,500.00 |
| Total Anticipated Inflows | | 215,500.00 | 20,500.00 | 12,500.00 | 11,500.00 | 11,500.00 | 10,000.00 | 10,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 7,000.00 | 7,000.00 | 325,500.00 |
| **Anticipated Outflows** | | | | | | | | | | | | | | | |
| Payroll & Severance | | 48,000.00 | 25,000.00 | 14,150.00 | | 14,150.00 | | 14,150.00 | | 14,150.00 | | 14,150.00 | | 14,150.00 | 157,900.00 |
| Rent - Waterside | | 3,125.00 | | | | 3,125.00 | | | | | 3,125.00 | | | | 9,375.00 |
| Rent - Summit | | 4,400.00 | | | | 2,200.00 | | | | | 2,200.00 | | | | 8,800.00 |
| Rent - Pelham | | 1,495.00 | | | | 1,495.00 | | | | | 1,495.00 | | | | 4,485.00 |
| Utilities | | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,800.00 |
| Vehicle Repairs | | 2,000.00 | | | | | | | | | | | | | 2,000.00 |
| Gas | | 350.00 | 350.00 | | | | | | | | | | | | 700.00 |
| Travel | | 500.00 | 500.00 | 250.00 | | | | | | | | | | | 1,250.00 |
| Health Insurance | | | | | | 10,500.00 | | | | 6,000.00 | | | | 6,000.00 | 22,500.00 |
| Insurance | | | 8,000.00 | | | | | 8,000.00 | | | | 8,000.00 | | | 24,000.00 |
| Advisory Fees | | 6,750.00 | 3,750.00 | | | 5,500.00 | | 3,750.00 | | 3,750.00 | | 3,750.00 | | 3,750.00 | 31,000.00 |
| GHB Reimbursement | | 13,536.54 | | | | | | | | | | | | | 13,536.54 |
| Bankruptcy Fees | | 35,000.00 | | | | | | | | | | | | | 35,000.00 |
| Professional Fees - Helmsing & Leach | | 2,500.00 | | | | | | | | | | | | | 2,500.00 |
| Bankruptcy Administration Fee | | | | | | | | | | | | | 1,419.00 | | 1,419.00 |
| Anticipated DIP Interest | | | | | | 708.33 | | | | 708.33 | | | | 708.33 | 2,125.00 |
| Total Anticipated Outflows | | 118,256.54 | 26,450.00 | 26,750.00 | 600.00 | 38,278.33 | 600.00 | 26,500.00 | 600.00 | 25,208.33 | 7,420.00 | 18,500.00 | 8,600.00 | 26,627.33 | 324,390.54 |
| | | | | | | | | | | | | | | | |
| Weekly Inflows (Outflows) | | 97,243.46 | (5,950.00) | (14,250.00) | 10,900.00 | (26,778.33) | 9,400.00 | (16,500.00) | 4,400.00 | (20,208.33) | (2,420.00) | (13,500.00) | (1,600.00) | (19,627.33) | 1,109.46 |
| Total Inflows (Outflows) | | 97,243.46 | 91,293.46 | 77,043.46 | 87,943.46 | 61,165.13 | 70,565.13 | 54,065.13 | 58,465.13 | 38,256.79 | 35,836.79 | 22,336.79 | 20,736.79 | 1,109.46 | |

# Exhibit B